**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

```
---------------------------------------------------------------x
                                                        :
KROLL, LLC,                                             :
                                                        :
                    Plaintiff,                          :    Civil Action No. _____
                                                        :
          - against -                                   :
                                                        :
JAMES LEONARD II,                                       :
                                                        :
                    Defendant.                          :
                                                        :
---------------------------------------------------------------x
```

## COMPLAINT

Plaintiff, Kroll, LLC ("Kroll," the "Company" or "Plaintiff"), by and through its undersigned attorneys, as and for its Complaint against Defendant, James Leonard II ("Leonard"), alleges as follows:

## INTRODUCTION

1.       Kroll, a globally renowned provider of risk and financial advisory services, brings this action for damages and injunctive relief against one of its former employees, arising from various acts of misconduct, including violation of his post-termination contractual obligations to Kroll, threatened misuse of Kroll's confidential information and trade secrets, and wrongful interference with Kroll's business relations and employees.

2.       Leonard, until recently, served as Kroll's Associate Managing Director within its Cyber Risk division, which, among other services, provides digital forensics and incident response ("DFIR") services and solutions with respect to cyberattacks, data breaches, intelligence threats, and forensic investigations for thousands of clients around the world.

3.       Although Leonard executed an agreement containing restrictions against the unauthorized use of confidential information and solicitation of customers and employees, he, along with three other executive employees within the Cyber Risk team, Benedetto Demonte

("Demonte"), Devon Ackerman ("Ackerman"), and Grant Duncan ("Duncan") (collectively with Leonard, the "Former Cyber Executives"),[1] each resigned from Kroll around the same time (three of them within a span of 24 hours) and are now widely reported to be joining a direct competitor of Kroll.

4.     Specifically, on July 9, 2024, it was reported in *Cyber Risk Insurer* that Ackerman, Demonte, and Leonard, among others, had recently resigned from Kroll "and are expected to reemerge at a rival firm in the coming weeks." The publication of the article in the wake of their resignations was, upon information and belief, part of a concerted campaign by the Former Cyber Executives and their new employer to steer clients away from Kroll, and indeed has already destabilized Kroll's business relations. Upon information and belief, their efforts to divert business away from Kroll began while they were still employed by Kroll given that in the weeks prior to their resignations, key clients of Kroll suddenly began to cease sending business to Kroll.

5.     Leonard was the primary point of contact for most of these client referral sources, and was primarily responsible for managing these relationships on Kroll's behalf.

6.     Upon information and belief, the Former Cyber Executives are also in the process of orchestrating a mass exodus of other Kroll employees. The article states that according to its sources "there are likely other Kroll DFIR executives who have either already exited the company or are planning to."

7.     This statement has been confirmed by certain employees of Kroll who have confided that they received communications from at least one of the Former Cyber Executives who, upon information and belief are acting in concert, about leaving Kroll. Another Cyber Risk

---

[1] Simultaneously with this action, an action is also being separately commenced against Demonte, Ackerman, and Duncan in Fairfax County Virginia for violation of their post-termination obligations to Kroll.

employee, Kelly McManus ("McManus"), who was originally cited in the article as having left Kroll, abruptly resigned on July 22, 2024. As of the filing of this Complaint, Kroll continues to obtain information that other employees are being contacted by the Former Cyber Executives, or someone on their behalf, about joining their organization.

8.     Further evidencing his nefarious intentions, Demonte factory-reset his Company-issued phone and tablet, thus failing to preserve text messages and other data contained therein. Ackerman also factory-reset his Company-issued tablet. Such actions blatantly disregarded express instructions at the time of their departure to "not wipe any company information or data from your phone, laptop, or other electronic devices," in addition to Kroll corporate policy, multiple active litigation hold notices in relation to other ongoing matters, and their contractual agreements with Kroll.

9.     As of the filing of this Complaint, Leonard has not yet returned any of his Company-issued devices, despite his obligation to do so.

10.     Given their years of experience as leaders in the cyber security industry, the Former Cyber Executives are each fully aware of the critical importance and need to safeguard and preserve Company data, but nevertheless knowingly destroyed evidence in an effort to cover their tracks, including any text messages evidencing their duplicitous conduct and showing whether confidential Kroll files or trade secrets were exchanged using those devices.

11.     The Former Cyber Executives' overarching plan is clear — to steer Kroll's clients and employees to a "rival firm." Their unlawful actions, among others, knowingly and intentionally perpetrated have caused both serious monetary injury and irreparable harm to Kroll.

12.      As the representative primarily responsible for managing Kroll's relationship with Kroll's clients and business referral sources, Leonard is an integral part of this scheme.

13.     Absent injunctive relief, Kroll faces irreparable injury, including the loss of customers, its competitive advantage, its trade secrets and goodwill in amounts which may be impossible to determine unless Leonard is enjoined and restrained by order of this Court.

## THE PARTIES

14.     Plaintiff Kroll, LLC is a Delaware limited liability company with its principal place of business located in New York, New York. Kroll's ultimate parent, Duff & Phelps Holdings Corporation is a Delaware corporation with its principal place of business located in New York, New York. Accordingly, for diversity purposes, Kroll is considered a citizen of the States of Delaware and New York.

15.     Upon information and belief, defendant Leonard is a citizen of the State of Tennessee and resides at 1111 Cheatham Drive, Columbia, Tennessee 38401.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.00 excluding interest and costs.

17.     This Court has personal jurisdiction over Leonard and venue is proper in this District by reason of the fact that Leonard is a citizen of the State of Tennessee and resides in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### I.     Overview of Kroll's Cyber Risk Business

18.     Kroll is a global provider of services and digital products related to valuation, governance, corporate intelligence and investigations, corporate finance, restructuring, financial advice, compliance, and cyber risks for private and public sector clients.

19.     Kroll is divided into several main business segments, including its Cyber Risk division. The Cyber Risk division provides a variety of cutting-edge services relating to managing cyber threats, including 24-7 incident responses, Business Email Compromise ("BEC") response and investigation, managed care services and security monitoring through its Kroll Responder managed detection and response ("MDR") platform to guard against cyberthreats and ransomware, threat assessments, and computer forensics, among other services.

20.     Although Kroll's Cyber Risk division services thousands of customers around the world, these clients are most typically sourced from a network of major law firms and insurance carriers who refer victims of cyberattacks to Kroll. These referrals routinely then become established long term customers of Kroll who rely upon Kroll to provide managed care services, be at the ready to immediately respond to cyber threats, and protect their data.

21.     The cyber risk and DFIR industry is highly competitive. In addition to traditional marketing methods, in order to generate and sustain business, Kroll invests considerable resources cultivating relationships with law firms and insurance carriers in order to maintain their position on a panel of a select few cybersecurity vendors to whom these law firms and carriers will refer their clients and insureds. Pricing of work is separately negotiated with these referral sources based upon a number of competitive factors including Kroll's use of highly proprietary technologies, and is considered highly confidential to Kroll. Kroll also invests significant resources expanding its relationships with the end-customer, which range from small businesses to Fortune 500 companies.

22.     Because Kroll's business is service oriented, the relationships that Kroll has with its customers are highly dependent on the attention and service, as well as Kroll's use of state-of-the-art technology, which Kroll gives to them on an ongoing basis. Investing in customer service

5

enables those who deal with Kroll to develop confidence in the quality of the services offered, and in increased recognition of, and familiarity with, Kroll as a provider of quality services.

23. Furthermore, because customers also entrust the protection of their business and their confidential information to Kroll, an essential aspect of the Company's business model is to protect its reputation and goodwill. Customer goodwill is particularly critical in this industry because any compromise of a customer's digital infrastructure could seriously damage its business operations and Kroll's reputation.

24. Maintaining customer relationships and generating repeat business from referral sources based on its reputation are thus critical to Kroll's success because long-term business relationships with established customers and referral sources allow Kroll to maintain its competitive advantage and strategic position in the industry.

25. Kroll's executives and sales representatives, including the Former Cyber Executives, who interface directly with existing and potential customers, not only are the face of the Company, but they benefit directly and indirectly from the goodwill, reputation, and name recognition generated by Kroll's investments in customer service and proprietary technology and consequently are able to forge relationships and cultivate accounts on behalf of Kroll.

26. Given that the Company's success and reputation in the market is also a function of competitive pricing, the Company treats pricing, customer and vendor contracts, profit and loss analysis, bid proposals, research and development into new technologies, sales and growth strategies, employee compensation data, and other similarly sensitive information as confidential and trade secret information.

27. To effectively service Kroll's customers, the Company also compiles data and reports pertaining to its customers spanning many years. Such customer information includes data reflecting all work done on behalf of particular customers, pricing arrangements, and the

identities of individual points of contact and so-called "breach coaches" among referral sources, and sales opportunities and trends.

28.     The foregoing compilation of information is treated as highly confidential and trade secret information by the Company because it would provide a competitor with a "playbook" into how to approach each referral source and customer and usurp its business from Kroll. Such information could also be used to undercut pricing and evaluate service opportunities.

29.     Kroll has spent a substantial amount of time and money in developing and acquiring all of the foregoing confidential information, to which the Company's trusted senior executives have access to enable them to cultivate customer relationships and expand the business on the Company's behalf.

30.     The foregoing confidential, proprietary and/or trade secret information is not generally known to the public.

31.     The foregoing confidential, proprietary and/or trade secret information would give a competitor who acquired it an unfair competitive advantage by, among other things: (a) not having to invest the time and resources to develop the customer relationships or information as the Company has done; and (b) allowing the competitor to unfairly compete by, among other things, leveraging their access to or knowledge of such information, including pricing and the aforementioned customer information.

32.     The Company takes the protection of its trade secrets and confidential information very seriously. Not only is all such data stored on password-protected servers requiring multi-factor authorization, but every Kroll employee is required at the outset of employment, where permitted by applicable law, to execute agreements with non-disclosure and other post-employment protective covenants. Employees are also required to preserve all Company data

and, upon termination of employment, to return all Company property, including any Company files and records in their possession.

33.     The Company also subjects all of its employees to various written policies, including an Acceptable Use of Assets Policy, a copy of which is attached hereto as Exhibit A. That policy expressly provides that all data, files, communications, and messages on any Company-issued devices, including text messages on phones, are the property of Kroll, and that any unauthorized use, removal, damage, or alteration of such files violates Kroll policy.

## II.     Leonard's Employment with Kroll

34.     Leonard was previously employed by Kroll between 2005 and 2011. In 2018, Leonard rejoined Kroll as Vice President, Cyber Risk.

35.     During his tenure with Kroll, Leonard's responsibilities expanded as he was elevated to more senior positions. At the time of his resignation from the Company, effective June 28, 2024, Leonard was serving as Associate Managing Director, with an annual compensation of approximately $400,000, exclusive of bonuses and commissions.

36.     In that role, Leonard had overall responsibility with regards to the Company's partnership with its key insurance carrier clients and managing those relationships. As such, Leonard also had access to a wide range of confidential and trade secret information, including financial metrics, profit and loss analysis, pricing, customer information, customer contracts, Kroll's use of proprietary technology, and sales and growth strategies.

37.     In addition to his salary, Kroll invested incalculable dollars and resources providing Leonard with a platform for career success, including enabling access to networking opportunities with existing and potential clients, speaking engagements, industry conferences, and cutting-edge advancements in the industry.

38.     At the time of his resignation, Leonard was primarily working remotely from his home in Tennessee.

39.     As a condition of his employment with Kroll, and at all times during their employment with the Company, Leonard was subject to confidentiality obligations and restrictive covenants designed to protect Kroll's confidential information, clients and employees for a period of at least two (2) years following his departure from the Company, as set forth in an offer letter agreement that he signed at the outset of his employment with Kroll (then known as Duff & Phelps) (the "Employment Agreement"). A copy of the Employment Agreement electronically signed by Leonard on December 3, 2018, is attached hereto as Exhibit B.

40.     More specifically, the Employment Agreement contains a provision governing the treatment of the Company's and its affiliates' (the "Company Group") work product and confidential information. That provision states in part:

Work Product; Confidentiality; Insider Information

Your entire work product (to the extent not already part of the public domain, and subject to the rights of clients or customers of the Company) which is related in any way to the business of the Company and its respective affiliates (collectively, the "Company Group"), including, but not limited to, all software, plans, products, publications, materials, inventions, writings, data or ideas conceived, developed or produced by you (your "Work Product"), shall be the exclusive property of the Company Group. You agree to assign to the Company Group all proprietary rights in and to your Work Product. You agree not to copy, disclose or make any other use of your Work Product during or after your employment, except in carrying out your duties as an employee.

You also agree to keep confidential all proprietary and confidential information and data belonging to, or otherwise concerning, the Company Group (the "Confidential Information"). Further, you agree not to copy, disclose, or otherwise use for the benefit of any party, other than the Company Group, any Confidential Information. You also agree not to use, share or disclose any Confidential Information that you have obtained during your employment with the Company, nor any Confidential Information that you obtain during your employment after the first date of employment ("Effective Date"), for your personal gain or advantage in securities or other transactions, or for the personal gain or advantage of anyone with whom you improperly

share this information. This restriction applies to such information related to any of the Company Group, and the Company Group's clients and their affiliates. The foregoing obligation does not apply to information, knowledge or data which now or hereafter is in the public domain (other than by reason of a breach of this provision by you). You shall not be in breach of this provision if you are required to disclose Confidential Information by a court of law or equity or by a governmental agency or other governmental authority if you have provided notice to the Company and give the Company an opportunity to limit or object to said disclosure. The obligations set forth in this paragraph apply both during and after your employment.

41. To further protect Kroll's confidential information, client relationships and employees, the Employment Agreement contains the following covenants against the solicitation of clients and employees of Kroll, and prohibits the disparagement of the Company:

<u>Non-Solicitation; Non-Disparagement</u>

You agree that while you are employed by any member of the Company Group, and in addition, during the period from the date of the termination of your employment for any reason until the second anniversary of the date of such termination of your employment (except as stated in paragraph 3 below), you will not, directly or indirectly, without the prior written consent of the Company.

1. Solicit or accept as a client to perform services of any type that the Company rendered ("Services"), or assist others to do the same, for any person or entity, (i) for which you provided Services as an employee of the Company related to the Company's business, or (ii) that becomes a client of the Company during the year following your departure and for which you participated in a proposal to provide Services, in each case as to which client you obtained confidential information of the Company during your employment with the Company. It shall not be relevant that a client desires or prefers that someone other than the Company render Services or that the client is already served by you or any person or entity with which you become associated [the "Client Non-Solicitation Covenant"];

2. Solicit, or assist others in soliciting, current or "Former" employees of the Company to become associated with, or perform Services on behalf of, you or any employer or third party, or to otherwise disrupt, impair, damage or interfere with the Company's relationship with its employees ("Former" employees are those who become or become such within six months before or after you leave the Company) [the "Employee Non-Solicitation Covenant"]; or

3. At any time following your termination of employment, you will not make, or cause to be made, to the media or otherwise in a manner intended

10

to achieve widespread publication or broadcast outside the Company Group or to substantial numbers of employees of the Company Group, any written or oral statements about any member of the Company Group that disparages or demeans such member of the Company Group or any of such member's then current and former partners, officers or directors [the "Non-Disparagement Clause"].

42.     As a sophisticated expert in the field of cyber security and data protection, Leonard indisputably understood the vital importance of the Company's non-disclosure restrictions and protective covenants. Indeed, Leonard expressly recognized and agreed "that the services to be rendered by [Leonard] under this [Employment Agreement] are of a special and unique character, that the Company will, as of the Effective Date, have made a substantial investment in the business with which [Leonard] will be involved under this [Employment Agreement], and that the restrictions on [Leonard's] activities contained in the above two sections headed "Work Product; Confidentiality; Insider Information" and "Non-Solicitation; Non-Disparagement (the "Restrictions") are required for the Company Group's reasonable protection."

43.     The Employment Agreement contains a choice of law provision that provides that it is governed by and construed in accordance with the internal laws of the state of New York.

44.     In addition, to the Employment Agreement, Leonard also executed separate agreements with Kroll in connection with his receipt of certain restricted equity and stock options. These agreements include the Delta Parent Holdings, Inc. 2020 Equity Incentive Plan Nonqualified Stock Option Agreement; the Delta Parent Holdings, Inc. 2020 Equity Incentive Plan Restricted Stock Unit Agreement; the Delta Parent Holdings, Inc. 2020 Equity Incentive Plan Convertible Preferred Restricted Stock Unit Agreement; and the Delta Parent Holdings, Inc. 2021 Incentive Plan Nonqualified Stock Option Agreement.

45.     In each of these equity agreements, Leonard expressly reaffirmed his agreement to be bound by the restrictive covenants in the Employment Agreement. As set forth in the equity

agreements, Leonard's receipt of benefits under those agreements is expressly conditioned upon his continued compliance with the foregoing restrictive covenants.

III. **The Former Cyber Executives' Resignations and Kroll's Discovery of Their Unlawful Conduct**

*The Former Cyber Executives Simultaneously Resign*

46.     Upon information and belief, in the Spring of 2024, the Former Cyber Executives were collectively scheming to leave Kroll at the same time to join a direct competitor and to bring with them other Kroll employees.

47.     On or about June 17, 2024, Demonte, formally resigned from Kroll, and his last day with Kroll was June 28, 2024.

48.     Less than a week after his departure, Ackerman and Leonard both tendered resignation notices on July 2, 2024.

49.     The next day, July 3, 2024, Duncan tendered his notice of resignation.

50.     Leonard's last day with Kroll was July 16, 2024.

51.     Following their notices of resignation, none of the Former Cyber Executives, including Leonard, would say to Kroll where they would be working next, despite repeated requests from various leaders within Kroll and Kroll's HR personnel. However, none of them have denied that they intend to move as a group to a direct competitor.

*Demonte and Ackerman Destroy Company Data, and Leonard's Failure to Return Company-issued Devices*

52.     As set forth above, pursuant to Kroll policy and their contractual agreements with Kroll, upon resignation, each of the Former Cyber Executives, including Leonard, is required to immediately return all Company property and Company Records in their possession, including Company-issued computer devices, tablets, and phones without damage or alteration.

53.     Upon receiving the devices from Demonte and Ackerman, Kroll discovered that both Demonte and Ackerman had factory-reset their Company-issued phones and tablets, effectively "wiping" and rendering unrecoverable certain contained therein, including text messages. The spoliated data would have included all text and instant messages contained in those devices.

54.     Demonte and Ackerman reset their devices, despite express instructions from Human Resources not to do so. Furthermore, per Company policy, as set forth above, all of those messages constitute Company Records and Kroll property, given they were exchanged using Company-issued devices.

55.     Despite their obligation to do so, as of the date of this Complaint, Duncan and Leonard have yet to return their Company-issued devices, including their laptops, and therefore continue to be in possession and threaten the misuse of Kroll's confidential, proprietary and trade secret information.

56.     Indeed, Leonard received specific instructions from Human Resources on July 11, 2024 to return his Company-issued devices, which include a phone and laptop computer, on his last day with Kroll. A copy of that email is attached hereto as Exhibit C.

57.     As executive leaders within Kroll's Cyber Risk division, each of the Former Cyber Executives, including Leonard, are aware of the Company's strict policy regarding the treatment of Company data, the need to protect such information from misuse and destruction, and the unlawfulness of their actions should they take any affirmative steps to remove, tamper with, or destroy such data.

58.     As experts within the digital forensic industry, each of the Former Cyber Executives, including Leonard, know that factory-resetting their phones and tablets would render unrecoverable certain data contained therein, including text messages.

59.     In addition to violating Company policy, the failure to preserve data on their Company-issued devices also violates multiple ongoing litigation hold notices to which the Former Cyber Executives were subject as executives of Kroll. These hold notices expressly instruct them not to destroy any emails, voice mails, and text messages, among other documents and communications.

*Leonard's Violation of the Restrictions in the Employment Agreement*

60.     In the midst of resignations of the Former Cyber Executives, on July 9, 2024, while Duncan, Ackerman, and Leonard were still employed by Kroll, an article was released in an industry publication, *Cyber Risk Insurer*, with the headline, "*Kroll DFIR leadership team exits, including Leonard, Ackerman, and Demonte*" (the "Press Release"). In the initial version of the Press Release, a copy of which is attached hereto as Exhibit D, the author states that "Kroll's senior leadership team within its digital forensics and incident response (DFIR) unit have left the company – including Jim Leonard, Devon Ackerman, and Ben Demonte – and are expected to reemerge at a rival firm in the coming weeks."

61.     Just two days later, Demonte – after previously advising Kroll during his separation that he had no employment prospects – informed Kroll that he intended to begin employment at a new company beginning on August 12, 2024.

62.     Based upon the foregoing chronology and factual circumstances, Kroll has reason to believe that Demonte, as the ring leader of the group, orchestrated the simultaneous departure of Ackerman, Duncan and Leonard and solicited them to join his new employer.

63.     Kroll contacted the publisher of the Press Release but the author refused to disclose his sources.

64.     While the source of the Press Release is currently unknown to Kroll, only the Former Cyber Executives and their new employer would stand to benefit from publicizing their

departure from Kroll. At that time, only a handful of senior leaders within Kroll were aware of the Former Cyber Executives' plan to leave Kroll as they were instructed not to speak to others within Kroll until a communications plan was developed.

65. Upon information and belief, the timing of the Press Release was intended to destabilize Kroll's business relationships to make it easier for the Former Cyber Executives to steer business away from Kroll. Indeed, it is already having an adverse impact on Kroll's business with multiple referral channels and clients referencing the Press Release as a reason to pause providing work to Kroll at this point in time.

66. The Press Release originally indicated that another Kroll employee, Kelly McManus, Senior Vice President, Cyber Risk, who reported directly to Leonard, was also departing Kroll. Based in the United Kingdom, McManus had key relationships with numerous clients and referral sources in Europe and would thus be a major asset were she to join Leonard.

67. McManus initially denied the report that she had left Kroll and had requested that the publisher remove her name from the article. The publisher did so, however, other than the reference to McManus, the publisher conveyed to Kroll that the remainder of the article was accurate with a high degree of confidence.

68. When confronted by Kroll about the Press Release, McManus claimed that she did not know the Former Cyber Executives' intended destination. However, she admitted that she had a discussion with Leonard about the Press Release and that Leonard had confided to McManus that he, Demonte and Ackerman would in fact be working together at another firm but purportedly would not say where.

69. Despite claiming that she did not know where the Former Cyber Executives were headed and that the report with respect to her departure from Kroll was false, on July 22, 2024, McManus abruptly resigned from Kroll.

70. Upon information and belief, Leonard and the other Former Cyber Executives not only solicited each other to leave Kroll, but Leonard has been working in concert with them to solicit other employees of Kroll to leave Kroll's employ in violation of his Employee Non-Solicitation Covenant. Indeed, the Press Release further reported that "there are likely other Kroll DFIR executives who have either already exited the company or are planning to."

71. In the days following their resignation, Kroll has learned from several of its employees that they had been recently contacted by the Former Cyber Executives, who attempted to encourage them to leave Kroll's employ. Such employees directly referenced conversations with the Former Cyber Executives disparaging Kroll, its leadership, and encouraging other Kroll employees to reconsider their continued employment at Kroll, whether employment elsewhere is something that would be better for their careers, and to "be on the lookout for where we go."

72. As recently as the filing of this Complaint, Kroll has learned that either Defendants or their suspected new employer, reached out to a number of employees in Kroll's DFIR team telling them their firm has "50 open slots" and that Kroll does not have a plan.

73. Kroll also has reason to believe that the Former Cyber Executives, including Leonard, have already violated the Client Non-Solicitation Covenant while they were still employed by Kroll.

74. In particular, around the same time as Demonte's resignation, certain insurance carrier clients with whom Leonard was primarily responsible for managing on behalf of Kroll ceased sending business to Kroll. Indeed, the Press Release was also issued while Leonard was still employed by Kroll.

75. Upon information and belief, the Former Cyber Executives have also been spreading misinformation and making disparaging statements about Kroll in furtherance of their

effort to interfere with Kroll's business relations with its referral sources and other clients and move business away from Kroll. For example, Kroll learned from one of its carrier clients that there is a rumor circulating that Kroll is now unable to provide any malware or BEC services. That claim is categorically false.

76.    Kroll also recently heard from a contact at one of its law firm clients that he heard that Kroll is "out of the industry." That claim too is false. Upon information and belief, the Former Cyber Executives are the source of these rumors and misinformation.

77.    The Former Cyber Executives' employment with a "rival firm" as reported in the Press Release violates the non-competition restrictions in Demonte's, Ackerman's and Duncan's agreements with Kroll and is part of the basis for the separate lawsuit against them in Virginia.

78.    Leonard's attempts to poach Kroll employees or encourage them to leave Kroll, as set forth above, violates the employee non-Solicitation covenant in the Employment Agreement.

79.    Leonard's interference with Kroll's customer relationships and attempts to move business away from Kroll, as set forth above, violates the client non-solicitation covenant in the Employment Agreement.

**IV.    The Irreparable Harm to Kroll**

80.    On July 15, 2024, Kroll sent a letter to Leonard reminding him of his post-termination obligations to Kroll, including the protective covenants contained in his Employment Agreement.

81.    Letters were also sent to Demonte and Ackerman reminding them of their post-termination obligations in their agreements with Kroll and demanding that they cease and desist from violating those obligations.

82. To date, Kroll has not received appropriate assurances in response to the foregoing letters that Leonard intends to abide by his post-termination obligations. Nor has Leonard returned any of his Company-issued devices and, therefore, continues to be in possession of Kroll's confidential information and trade secrets contained in those devices.

83. Due to Leonard's conduct, Kroll stands to lose an incalculable amount of dollars in business and the loss of value of their goodwill, valuable relationships with its customers and referral sources, which cannot be addressed at law.

84. Upon information and belief, Leonard, together with the other Former Cyber Executives further intend to decimate Kroll's Cyber Risk business by recruiting other Kroll employees or encouraging them to leave Kroll's employ, and by spreading misinformation about Kroll's business.

85. All told, the Former Cyber Executives, including Leonard, are causing, threatening and/or will continue to cause or threaten significant irreparable harm to Kroll, as well as damage to Kroll's reputation as an industry leader.

86. Money alone cannot make Kroll whole.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

87. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

88. Leonard entered into the Employment Agreement during his employment with Kroll.

89. The Employment Agreement is a duly executed and enforceable contract, giving rise to legal obligations between Leonard and Kroll, including the restrictive covenants contained therein.

90.     The restrictive covenants in the Employment Agreement remain in full force and effect and are supported by good consideration.

91.     The restrictive covenants in the Employment Agreement are necessary and tailored to protect Kroll's legitimate business interests, including but not limited to Kroll's customer and employee relationships, goodwill, and confidential and proprietary business information.

92.     By the acts described above, Leonard breached the Employment Agreement by, *inter alia*, (1) actively soliciting Plaintiff's customers and inducing them to terminate their relationship with Kroll, or otherwise diverting business away from Kroll; (2) conspiring with the other Former Cyber Executives to join a direct competitor and recruiting other Kroll employees or encouraging them to leave Kroll's employ; and (3) failing to return Kroll property in his possession, including his Company-issued devices.

93.     Upon information and belief, Leonard's breaches of the restrictive covenants continue to this day, resulting in ongoing loss of business, and will continue unless and until he is ordered to abide by the obligations to which he agreed when he executed the Employment Agreement.

94.     As a direct result of Leonard's breaches, Kroll is suffering and will continue to suffer irreparable injury, including loss of business expectancies, customers, employees, its confidential information, and damage to goodwill, for which a remedy at law is inadequate. Accordingly, Kroll is entitled to injunctive and equitable relief.

95.     In addition, as a result of Leonard's breaches of the Employment Agreement, Kroll seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

96.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

97.    In his role at Kroll, Leonard was placed in a position of trust and confidence, and was expected to devote his full time to the management and promotion of Kroll's business interests.

98.    As a result of this special relationship, Leonard owed certain fiduciary duties to Kroll including a duty of loyalty and honesty, and a duty not to act in any way contrary to the interests of Kroll, including, but not limited to, a duty, while still employed with Kroll and being compensated by Kroll: (a) not to compete with Plaintiffs; (b) not to usurp corporate opportunities or divert business on behalf of another; (c) not to solicit Kroll's customers or employees on behalf of another; (d) to help preserve customer relationships; (e) not to misuse or misappropriate the Company's confidential or trade secret information; (f) to return Company property upon cessation of employment; and (g) not to be deceitful to the Company.

99.    Notwithstanding these obligations and duties, and in violation thereof, Leonard breached his fiduciary duty of loyalty and honesty to Kroll by, among other willful acts of misconduct, while still employed with the Company, and while having access to the Company's confidential, proprietary, and trade secret information: (a) working in concert with the other Former Cyber Executives to violate their contractual agreements to Kroll by soliciting each other to join a direct competitor; (b) working in concert with the other Former Cyber Executives to divert the business of Kroll's customers to a competitor of the Company; and (c) working in concert to solicit other Kroll employees to leave Kroll's employ.

100.   Leonard further breached his fiduciary duty to Kroll by failing to immediately return Kroll property and still having access to Kroll confidential information and trade secrets

20

on Company-issued devices in his possession while working in competition with Kroll or intending to compete with Kroll.

101.    As a consequence of Leonard's breaches of his fiduciary duty of loyalty to the Company, Kroll has been injured and faces irreparable injury.  Plaintiff is threatened with loss of business expectancies, losing customers and employees, further misuse of its confidential and trade secret information, and loss of goodwill in amounts which may be impossible to determine, unless Defendant is enjoined and restrained by order of this Court.

102.    In addition, as a consequence of Leonard's breach of his fiduciary duty, Plaintiff seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

<h3 style="text-align:center">AS AND FOR A THIRD CAUSE OF ACTION<br>(Unfair Competition)</h3>

103.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

104.    Leonard undertook the foregoing acts of misconduct, either individually or in concert with the other Former Cyber Executives, including soliciting customers to move their business away from Kroll, soliciting employees to leave Kroll's employ, spreading misinformation concerning Kroll's business, and destroying Company Records as they were departing Kroll, all for his own self-interest and to gain an unfair competitive advantage in competing with Kroll.

105.    As a consequence of Leonard's unfair competition, Plaintiff has been injured and faces irreparable injury. Plaintiff is threatened with loss of business expectancies, losing customers and employees, further misuse of their confidential information, and loss of goodwill in amounts which are impossible to determine, unless Leonard is enjoined and restrained by order of this Court.

106. In addition, as a result of Leonard's unfair competition, Plaintiff seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and costs.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Tortious Interference With Business Relationship)**

107. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

108. Until the events giving rise to this action, Kroll had maintained valid business relationships, or the expectancy of business relationships, with its customers and referral sources. Kroll had the reasonable expectation that these relationships and prospective relationships would continue and would not be unjustifiably disrupted.

109. Leonard was and remains aware of these customer and business relationships and/or expectancies.

110. Notwithstanding their knowledge of the existence of these relationships and expectancies, Leonard, individually or in concert with the other Former Cyber Executives, intentionally and unjustifiably interfered with these relationships by spreading misinformation and disparaging Kroll's business, and soliciting them to terminate their relationships with Kroll with the goal of moving their business away from Kroll.

111. As a result of Leonard's tortious interference with Kroll's business relationships with its customers, Kroll will be threatened with loss of business expectancies, customers, employees, its trade secrets and goodwill in amounts which may be impossible to determine, unless Leonard is enjoined and restrained by order of the Court.

112. In addition, Kroll seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**WHEREFORE**, Kroll respectfully requests that the Court enter Judgment in its favor and an Order against Leonard that grants the following relief:

1. An injunction that:

   (a) Preliminarily and permanently enjoins each Leonard from violating his restrictive covenants with Plaintiff;

   (b) Preliminarily and prospectively enjoins Leonard, and all parties in active concert or participation with them, from accessing, using or disclosing any of Plaintiff's confidential, proprietary and trade secret information;

   (c) Preliminarily and prospectively enjoins Leonard, and all parties in active concert or participation with him, for a period of two (2) years from the date of his last violation of the restrictive covenants in the Employment Agreement, from, directly or indirectly, soliciting or moving the business of any of Plaintiff's customers and business relations, accepting business from any of Plaintiff's customers and business relations;

   (e) Preliminarily and prospectively enjoins Leonard, and all parties in active concert or participation with him, for a period of two (2) years from the date of his last violation of the restrictive covenants in the Employment Agreement, from directly or indirectly, soliciting or interfering with any of Kroll's employees, or encouraging or inducing them to leave Kroll's employ.

2. Orders that Leonard, and all parties in active concert or participation with them, to return to Kroll all originals and copies of all files, devices, electronic media and/or documents that contain or relate to Kroll's confidential, proprietary and trade secret information;

3. Actual, incidental, compensatory, and consequential damages in an amount to be proven at trial;

4. Punitive damages in an amount to be proven at trial due to Leonard's willful and malicious conduct;

5. Costs and expenses incurred herein, including reasonable attorneys' fees and interest;

6. All other relief as the Court may deem just, equitable and proper.

23

Dated:  July 25, 2024

Respectfully Submitted,

s/ Robert F. Tom
Robert F. Tom, BPR No. 26636
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, TN  38103
Telephone: (901) 526-2000
Email: rtom@bakerdonelson.com

Christopher J. Barrett, BPR No. 032978
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, TN  37203
Telephone: (615) 726-5600
Email: cbarrett@bakerdonelson.com

James S. Yu (*pro hac vice forthcoming*)
Matthew Catalano (*pro hac vice forthcoming*)
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 218-5500
Email: jyu@seyfarth.com
Email: mcatalano@seyfarth.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2024, a copy of Plaintiff's Complaint was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

s/ Robert F. Tom